1

2

3

4

5

6                        **UNITED STATES DISTRICT COURT**

7                            **DISTRICT OF NEVADA**

8

9    THOMAS DAVIS, III et al.,                  )
                                                 )
10                        Plaintiffs,            )
                                                 )
11            vs.                                )        2:08-cv-00722-RCJ-PAL
                                                 )
     WESTGATE PLANET HOLLYWOOD LAS               )            **ORDER**
12   VEGAS, LLC et al.,                          )
                                                 )
13                        Defendants.            )
     _____        )

14

15           This is a class action brought by former salespersons for Defendants' alleged failure to

16   pay statutory minimum wages and overtime under Nevada and Florida law, as well as their

17   failure to pay contractual commissions and bonuses.  Before the Court is a motion to certify the

18   class.  For the reasons given herein, the Court denies the motion.

19   **I.      FACTS AND PROCEDURAL HISTORY**

20           Defendants Westgate Planet Hollywood Las Vegas, LLC; Westgate Resorts, Inc.;

21   Westgate Resorts Ltd.; CFI Sales & Marketing, Ltd.; CFI Sales & Marketing, LLC; and CFI

22   Sales & Marketing, Inc. (collectively, "Westgate") are business entities engaged in the

23   development, marketing, management, and sales of fractional interests in time share

24   condominiums and resorts.  Westgate employed Plaintiff Thomas Davis, III as a salesperson in

25   its Las Vegas time share sales business.  After several years of employment, Davis, who had

1  been paid on a flat commission system, determined that Westgate had failed to pay him either

2  minimum wage or overtime pay.  He also believed Westgate had made improper deductions

3  from his pay and had not paid him commissions he was owed.

4        On May 13, 2008, Davis filed the Complaint in state court, alleging five causes of action:

5  (1) violations of the Fair Labor Standards Act ("FLSA") for Westgate's failure to pay minimum

6  wages and overtime; (2) violations of Nevada's labor laws (Nevada Revised Statutes ("NRS")

7  sections 608.016, 608.018, 608.109, 608.100, and 608.250) for unpaid wages, unpaid minimum

8  and overtime wages, and unpaid rest periods; (3) violations of NRS section 608.040 for unpaid

9  wages owed after discharge; (4) breach of contract; and (5) conversion.  The Complaint alleged

10  there were "at least 1000 putative class members nationwide and over 500 Nevada Subclass

11  members."  In addition to the FLSA collective action, Davis sought class certification of the state

12  law claims.  Westgate removed based on both the FLSA claim and the Class Action Fairness

13  Act.  The Second Amended Complaint is the operative version of the Complaint.

14  **II.    LEGAL STANDARDS**

15        In order to obtain class certification under Rule 23, Plaintiffs must satisfy two sets of

16  criteria.  First, Plaintiffs must show each of the following:

17        (1) the class is so numerous that joinder of all members is impracticable;

18        (2) there are questions of law or fact common to the class;

19        (3) the claims or defenses of the representative parties are typical of the claims or
      defenses of the class; and

20

21        (4) the representative parties will fairly and adequately protect the interests of the
      class.

22  *Rodriguez v. Hayes*, 591 F.3d 1105, 1121–22 (9th Cir. 2010) (citing Fed. R. Civ. P. 23(a)).  Second,

23  plaintiffs must show at least one of the following:

24        (1) prosecuting separate actions by or against individual class members would create
      a risk of:

25              (A) inconsistent or varying adjudications with respect to individual class

members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(1)–(3); *see Hayes*, 591 U.S. at 1122. A district court should not address the merits of the case when determining certification under Rule 23, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974) (holding that a class action plaintiff cannot argue the merits of his case to circumvent the Rule 23 certification requirements), unless the merits at issue concern the requirements of certification under Rule 23, in which case the court must address the issue, *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1178 n.2 (9th Cir. 2007) (citation omitted). A district court may dismiss an action on the merits before determining certification. *See Marx v. Centran Corp.*, 747 F.2d 1536, 1552 (6th Cir. 1984).

III.   **ANALYSIS**

   A.   **The Contracts**

Plaintiffs have asked the Court to certify the following classes:

1

**NEVADA WAGE CLAIMS**

2

3

All persons employed by Defendants as timeshare salespersons or closing officers at Defendants' timeshare resorts in the State of Nevada who were paid on a commission only or flat fee basis[;]

4

**FLORIDA WAGE CLAIMS**

5

6

All persons employed by Defendants as timeshare salespersons or closing officers at Defendants' timeshare resorts in the State of Florida who were paid on a commission only or flat fee basis[; and]

7

**BREACH OF CONTRACT CLAIMS**

8

9

All persons employed by Defendants as timeshare salespersons or closing officers at Defendants' timeshare resorts in Nevada or Florida who have a state law wage and hour claim certified by this Court.

10    (Mot. to Certify Class 4–5, Mar. 4, 2011, ECF No. 441).  Plaintiffs adduce fifteen exhibits, some

11    of which contain multiple documents, in support of their motion to certify these classes.

12         Exhibit 1 consists of six exemplar contracts between unidentified persons and CFI Sales

13    and Marketing, Ltd. ("CFI, LP"), described in the contracts as a Florida limited partnership.  All

14    of the exemplar contracts are between unidentified persons and CFI, LP.  The exemplar contracts

15    appear to contemplate work in Nevada.  It is not immediately clear which state's wage and hour

16    laws would apply to which contracts.

17         There are two broad types of contract adduced.  Type I contracts are those that appear to

18    be, as they are entitled, independent contractor agreements.  Type II contracts are also entitled as

19    independent contractor agreements, but they may in reality constitute direct employment

20    agreements.  There are subtypes of each type of agreement.

21         **1.     Type I Contracts**

22         **a.     Type IA**

23         The Type IA exemplar contract was entered into on April 21, 2005 between a person

24    whose name is redacted and CFI, LP. (*See* Type IA Contract, Apr. 21, 2005, ECF No. 441, at

25    Bates WEST1090).  Compensation under the Type IA contract was to be provided "in the

manner specified in Exhibit 'A,' attached hereto and incorporated herein . . . ." (*Id.* para. 2).[1]
Exhibit A, entitled "Commission Schedule Las Vegas," provides for payment of "a base
commission" every week. (*See id.* at WEST1092).  The base commission is 8% on the sale of
any one-, two-, three-, or four-bedroom unit or any half-week stay that is accompanied by a 10%
down payment. (*See id.*).  It is critical to note that Type I contracts do not appear to require any
payment at all on any given week, but only that whatever base commission is earned is payable
on a weekly basis.  This is the crux of the Type I contracts.  They require the periodic (weekly)
payment of whatever commission has been earned during the past week, but they do not appear
to require any wages or any particular hours of work, which is why they appear to be
independent contractor agreements as they proclaim themselves to be.

For full-down-payment sales, salespersons receive 50% of their base commission
immediately, up to a maximum of $500, and a salesperson may demand immediate payment of
up to 25% of the base commission on any sale. (*See id.* at WEST 1093).[2]  On the other hand,
until a salesperson has established a reserve of $3500, 10% of the commission earned on each
sale is retained by CFI, LP in the salesperson's reserve account. (*See id.*).  The reserve account
exists so that in the event a customer fails to make six consecutive monthly payments or the
minimum 10% down payment after purchase, CFI, LP may charge back the salesperson's
commission on that sale from the salesperson's reserve account. (*See id.*).

In addition to the base commissions, a contractor under a Type I contract may earn
monthly bonuses. (*See id.* at WEST1092).  To calculate a monthly bonus, one first calculates the
"good sales volume" for a given month, which equals the amount in full-down-payment sales for

---

[1]All six of the exemplar contracts refer to their respective exhibits A for incorporation of
the manner of compensation, and the similarity or dissimilarity of the various exhibits A are
therefore critical to the determination of class certification.

[2]Presumably, the remaining commission would be paid at the end of the sales week, but
the example in the contract indicates it would be paid "in 21–28 days." (*See id.*).  This ambiguity
would likely have to be construed against the drafter, CFI, LP.

the month plus the amount in previous partial-down-payment sales that customers pay in full during the month. (*See id.*).  If a salesperson's good sales volume for a given month exceeds $39,999,[3] the salesperson is entitled to a bonus of 1% to 5% of the good sales volume for that month, based on a chart provided in Exhibit A. (*See id.*).  The bonus for a given month is calculated on the 15th of the following month and paid at the last weekly pay period of the following month. (*See id.*).

Finally, a salesperson is entitled to a $40 commission for the sale of each full-down-payment, full-week vacation occupancy agreement ("VOA"). (*See id.* at WEST1094).  If a VOA is later converted to a sale, the salesperson is entitled to only 50% of the base commission (4%) that would otherwise be due on the sale, but if the VOA is converted to a sale before the customer occupies the unit under the VOA, the full 8% commission rate applies. (*See id.*).  VOAs converted to sales are included in the good sales volume for the month in which the customer makes full payment on the sale. (*See id.*).

**b.    Type IB**

The Type IB exemplar contract was entered into on September 21, 2005 between a person whose name is redacted and CFI, LP. (*See* Type IB Contract, Sept. 21, 2005, ECF No. 441, at Bates WEST0855).  The Type IB contract is the same as the Type IA contract, except for four differences.  First, the base commission is 8% for regular sales but only 7% for "any VOA upgrade to a sale." (*See id.* at WEST0857).  Second, the good sales volume required to obtain a monthly bonus is $59,999, and the bonus range is 2% to 5.5%. (*See id.*).  Third, there appears to be no ability for a salesperson to demand immediate payment of 25% of the commission on any sale. (*See id.* at WEST0858).  Fourth, for VOAs later converted to sales, the salesperson is

---

[3]The text indicates "exceeds $39,999.00," but the table begins at "$40,000," leaving open whether a bonus would apply to a monthly good sales volume of $39,999.50, for example. (*See id.*).  The ambiguity would likely have to be construed against the drafter.

1    entitled to a 7% base commission. (*See id.* WEST0859).[4]

2        **c.    Type IC**

3        The Type IC exemplar contract was entered into on May 25, 2007 between a person

4    whose name is redacted and CFI, LP. (*See* Type IC Contract, Sept. 21, 2005, ECF No. 441, at

5    Bates WEST0906).  The Type IC contract is the same as the Type IB contract, except for one

6    difference: the good sales volume required to obtain a monthly bonus is $75,000, and the bonus

7    range is 2% to 6%. (*See id.* WEST0908).

8        **d.    Type ID**

9        The Type ID exemplar contract was entered into on January 21, 2009 between a person

10   whose name is redacted and CFI, LP. (*See* Type ID Contract, Jan. 21, 2009, ECF No. 441, at

11   Bates WEST0956).  The Type ID contract is the same as the Type IC contract, except for four

12   differences: (1) as opposed to the other Type I contracts, which appear to contemplate sales in

13   Las Vegas, the Type ID contract appears to contemplate sales throughout Florida; (2) base

14   commissions range from 7% to 13% and depend on the category of customer; (3) self-generated

15   sales approved by the Director of Sales and accompanied by a down payment (of unspecified

16   amount) earn a base commission of 15%; and (4) bonuses are not contemplated. (*See id.*

17   WEST0958–WEST0959).  The Type ID contract is the most unique of the Type I contracts.

18       **2.    Type II Contracts**

19       **a.    Type IIA**

20       The Type IIA exemplar contract was entered into on January 21, 2009 between a person

21   whose name is redacted and CFI, LP. (*See* Type IIA Contract, Jan. 21, 2009, ECF No. 441, at

22   Bates WEST1474).  The essential difference between Type I and Type II contracts is the use in

23   Type II contracts of an alternative, complex method of compensation called a "daily draw." (*See*

24   *id.* WEST1476).  Under this system, the salesperson receives as compensation the greater of: (1)

25

---

[4]This is perhaps redundant with the first difference.

1  an 8% commission for the sale of any one-, two-, three-, or four-bedroom unit or any half-week

2  stay accompanied by a 15% down payment; or (2) a daily draw. (*See id.*).  The contract does not

3  explain the daily draw system well.  Under section I of the contract, the salesperson's

4  compensation is described as the greater of certain commissions or the daily draw.  However,

5  section II states, "Once engaged by Westgate, Independent Contractor shall receive commission

6  through a daily draw." (*Id.*).  Section II appears to conflate what section I had previously referred

7  to separately in the disjunctive: "commission" and "daily draw." (*See id.*).

8      The daily draw resembles a wage system on its face. (*See id.* ("The draw available to the

9  Independent Contractor on a daily basis shall be based on the number of days Independent

10 Contractor shall work in a given week[, and] shall be deducted from Independent Contractor's

11 total commission once said commission becomes due.  Daily draw shall be paid on a weekly

12 basis according to Westgate's policies.")).  However, the daily draw system also could be fairly

13 interpreted as a system for distributing earned commissions evenly over time to help ensure

14 steady income to salespersons whose weekly sales success fluctuates.  The daily draw is set at

15 $80 or $120, depending on the salesperson's "VPG," which does not appear to be defined in the

16 contract. (*See id.*).  If a sale upon which a daily draw was credited is cancelled, the amount is

17 charged against future commissions. (*See id.*).  It is not clear whether a daily draw is

18 contemplated when a salesperson has no earned commission from which to subtract it.  If not,

19 the system is not like a wage system.  And even if a daily draw is contemplated where there is no

20 earned commission from which to subtract it, if any negative balance is charged against future

21 commissions, the system still does not necessarily resemble a wage system.  Type II contracts

22 contain charge back and reserve clauses similar to those contained in Type I contracts.  In

23 summary, Type II contracts might constitute direct employment contracts for wages in some

24 cases.

25 *///*

### b.    Type IIB

The Type IIB exemplar contract was entered into on October 25, 2005 between a person whose name is redacted and CFI, LP. (*See* Type IIB Contract, Oct. 25, 2005, ECF No. 441, at Bates WEST1106). The Type IIB contract is similar to the Type IIA contract, except that it provides for a "weekly draw" against earned commissions at the salesperson's option in lieu of the "half-check" system used under Type I contracts. (*See id.* at WEST1110–WEST1111). The weekly draw is based on $60 to $120 per day, depending on volume per guest ("VPG"), which is defined as the weekly total net sales volume divided by the number of tours given. (*See id.* at WEST1109–WEST1111). The base commission ranges from 5.5% to 12.5% during the first year and from 6% to 13% thereafter, depending on the salesperson's closing percentage ("CP"), which is defined as the number of sales divided by the number of tours given over the past four-month rolling period. (*See id.* at WEST1108–WEST1109). Self-generated sales always earn 15% commission, and certain other categories of sales always earn 9% or 10% commission, regardless of the salesperson's current CP. (*See id.* at WEST1109). This is just an overview. The compensation system under the Type IIB contract is detailed and complex.

### B.    Other Evidence

Exhibit 2 consists of the declarations of Plaintiffs Davis, Lois Tiger, and Emmanuel Wiest, who all attest that they were employed by Westgate as salespersons in Nevada and/or Florida, that they worked more than forty hours per week without overtime pay, and that they were treated like direct employees who would be terminated if they did not show up to work, often for more than forty hours per week.

Exhibit 3 is Tiger's deposition, wherein she testified to the effect that Westgate's independent contractors are in fact treated like direct employees and that Westgate made it difficult for her to obtain monies due to her under her contract. (*See* Tiger Dep. *passim*, Jan. 4, 2010). Tiger identified her signed July 12, 2005 "independent contractor agreement" during the

1   deposition. (*See id.* 76:2–13).  This date does not match any of the exemplar contracts, and it is

2   not clear from the deposition what type of contract Tiger signed.

3        Exhibit 4 is John Willman's deposition.  Willman testified on behalf of Westgate and CFI

4   as their designated deponent. (*See* Willman Dep. 7:8–20, Nov. 19, 2010).  Willman clarified that

5   Westgate Resorts, Ltd. was the single member of CFI Sales & Marketing, LLC. (*See id.* at 25).

6   He also testified that CFI Sales & Marketing, Ltd. no longer existed, but was consolidated into

7   CFI Sales & Marketing, LLC, which itself ceased operations in June 2010. (*See id.* at 26–27, 34).

8    CFI Sales & Marketing, Inc. did not directly participate in timeshare sales but was involved in

9   related business. (*See id.* at 27).  Westgate Resorts, Ltd. was also the single member of Westgate

10  Marketing, LLC and Westgate Planet Hollywood Las Vegas, LLC. (*See id.* at 34–35).  Westgate

11  Resorts, Inc. is wholly owned by the DAS Revocable Trust and has a 0.5% partnership interest

12  in Westgate Resorts, Ltd. (*See id.* at 35).  The DAS Revocable Trust itself has a 0.5% partnership

13  interest in Westgate Resorts, Ltd., and Central Florida Investments, Inc. has a 99% partnership

14  interest. (*See id.* at 36).  Westgate Marketing, LLC pays and supervises the independent

15  contractors involved in the present lawsuit. (*See id.* at 55).  There had been between 5000 and

16  6000 independent contractors over the last decade. (*See id.* at 57).  Willman did not testify as to

17  the number of different types of contracts used for independent contractors or how many

18  salespersons were employed under each type.

19       Exhibits 5 and 6 are the reports of an expert witness, Robert A. Taylor, a California CPA.

20  Taylor has estimated hours worked by Westgate employees and damages based on unpaid wages

21  in both Nevada and Florida.  The exhibits to his reports are attached via DVD-R and indicate

22  approximately $15 million in unpaid wages for the Florida salespersons and approximately $3

23  million in unpaid wages for the Nevada salespersons.  The reports also indicate approximately

24  $500,000 in commissions due and approximately $140,000 in bonuses due.  There are thousands

25  of pages of charts.

1    Exhibit 7 is the deposition of Clifford "Earl" Collins, Jr., a software architect at

2    Westgate. (*See* Collins Dep. 5–7, Nov. 18, 2010).  He testified as to Westgate's automated

3    calculations of bonuses. (*See id. passim*).

4    Exhibit 8 is the deposition of Garrett Stump, the Executive Director of Enterprise at CFI

5    Westgate Reports. (*See* Stump Dep. 4, Apr. 28, 2010).  He manages CFI Westgate's software

6    personnel. (*See id.* at 5).  He also testified as to Westgate's automated record keeping. (*See id.*

7    *passim*).

8    Exhibit 9 is the deposition of Lisa Hemphill, Westgate's representative to testify as to

9    software issues. (*See* Hemphill Dep. 6, Nov. 18, 2010).  She began working for Westgate as a

10   "contracts processor," inputting contracts for the sale or lease of property into Westgate's

11   computers. (*See id.* at 7–8).  In 1989, she became an office manager for contracts. (*See id.* at 8).

12   She eventually became an administrative assistant, an executive administrative assistant, and

13   then sales operation manager, which is her current title. (*See id.* at 9–10).  She does not deal with

14   Westgate employees with respect to their employment. (*See id.* at 11).  She noted that she knew

15   there were different kinds of contracts with different commission structures. (*See id.* at 23).  She

16   believed that persons hired in the same "track" would have the same commission structure. (*See*

17   *id.* at 31).  If the commission structure were changed at a particular location, the employee would

18   sign a new contract. (*See id.* at 32).  Hemphill was unable to explain exactly what she meant by

19   "track." (*See id.* at 65).  However, she subjectively believed that all independent contractors at

20   any given resort were paid the same based on her belief that the resort would contact all

21   salespersons upon any change in commission structure so that the change would apply to

22   existing salespersons retroactively without them signing a new contract. (*See id.* at 65–66).

23   Exhibit 10 is the deposition of Jennifer Richards, a human resources employee for

24   Westgate responsible for inprocessing new employees. (Richards Dep. 6–9, Nov. 18, 2010).  She

25   began working at Westgate as a salesperson. (*See id.* at 11–12).  She testified that whenever

1    Westgate changed the commission structure, it would hold a meeting of sales representatives and

2    either have them sign new contracts or just hand out a memorandum explaining the new structure

3    and have everyone sign an amendment. (*See id.* at 14).  Some salespersons with more

4    experience, however, could have better commission scales than other salespersons. (*See id.* at

5    27–28).

6       Exhibit 11 is the deposition of David Siegel, the founder of Westgate. (Siegel Dep. 5,

7    Dec. 14, 2010).  He testified that the salespersons are trained by Westgate on Westgate's

8    property, perform most of their work on Westgate's property, and only have to provide "[a] pen

9    or pencil" themselves. (*See id.* at 15–18).  Siegel himself crafted the reserve and charge back

10    rules in the contracts, and "probably" approved the advance commission system. (*See id.* at

11    20–21).  He testified that he hadn't seen any of the contracts "in many, many years." (*See id.* at

12    25).  He noted that Westgate does employ salaried salespersons who earn no commissions but

13    that most of Westgate's salespeople worked for commission. (*See id.*).  Siegel believed that the

14    commissioned salespersons were paid the minimum wage because they were paid a daily wage.

15    (*See id.* at 26).  The salespersons had no part in recruiting customers who visited the resort

16    locations or screening their creditworthiness, but were expected to attempt to sell to everyone

17    who walked through the door. (*See id.* at 28).  Siegel testified that Westgate considered it

18    unacceptable for a salesperson to be absent several days in a row. (*See id.* at 30–31).

19       Exhibits 12, 13, and 14 are expert reports from Robert A. Taylor concerning

20    commissions that should have been paid to salespersons in Florida and Tennessee.  The exhibits

21    are attached in electronic form on a DVD-R.  Taylor notes that the analysis is preliminary, based

22    on exemplar contracts.

23       Exhibit 15 consists of the firm resumes of Wexler Wallace LLP, Sommers Schwartz,

24    P.C., Greg Coleman Law PC, and Avanti Law Group, PLLC.

25    *///*

1

**C.    Certification**

2

**1.    Commonality**

3    The evidence Plaintiffs adduce, particularly the exemplar contracts, fails to show

4  commonality between the putative class members.  Like with the many anti-foreclosure actions

5  currently pending before the Court, there are at least six, and potentially many more, versions of

6  the relevant contracts at issue in the present case, and each of them is complex enough to merit

7  separate consideration based on each separate Plaintiff's claims thereunder.  If there were only

8  one type of contract, and each Plaintiff claimed essentially identical breaches or statutory

9  violations by Defendants with only particular variations in unpaid wages and commissions, there

10  would be a commonality of claims.  And there would be internal commonality within six (or

11  more) subclasses if the exemplar contracts adduced represented the only six types of contract in

12  dispute.  But Plaintiffs ask the Court to certify broad categories of classes, without distinguishing

13  between the types of contract at issue:

14                    **NEVADA WAGE CLAIMS**

15    All persons employed by Defendants as timeshare salespersons or closing officers
      at Defendants' timeshare resorts in the State of Nevada who were paid on a
16    commission only or flat fee basis[;]

17                    **FLORIDA WAGE CLAIMS**

18    All persons employed by Defendants as timeshare salespersons or closing officers
      at Defendants' timeshare resorts in the State of Florida who were paid on a
19    commission only or flat fee basis[; and]

20                 **BREACH OF CONTRACT CLAIMS**

21    All persons employed by Defendants as timeshare salespersons or closing officers
      at Defendants' timeshare resorts in Nevada or Florida who have a state law wage and
22    hour claim certified by this Court.

23  (Mot. to Certify Class 4–5, Mar. 4, 2011, ECF No. 441).  The third class would consist of the

24  combination of the first two classes.  The gravamen of the claims are twofold: (1) Defendants

25  failed to pay wages as required under state law; and (2) Defendants failed to pay commissions

1    and bonuses as required under the contracts.  As discussed, although all six types of exemplar

2    contracts purport to be independent contractor agreements, Type I contracts appear in reality to

3    be independent contractor agreements, whereas Type II contracts may in fact be employment

4    contracts disguised as independent contractor agreements.  It is likely that no wage claims lie

5    under Type I agreements, but wage claims may lie under Type II agreements.  Breach of contract

6    claims may lie under either type of agreement, because commissions and bonuses are payable

7    whether any particular contract is for independent services versus direct employment.  Based on

8    the exemplar contracts, there is an insufficient commonality of claims among the broad putative

9    classes Plaintiffs ask the Court to certify.  Although Taylor is capable of making a damages

10   calculation manageable, he apparently made his present calculations without knowing which

11   employees were under which types of contract for which periods of time, which premises are

12   critical to a proper calculation.

13              **2.       Numerosity and Typicality**

14              It is not clear from the evidence attached to the motion how many named Plaintiffs or

15   putative class members claim to have entered into which type of contract.  Plaintiffs simply

16   adduce six types of exemplar contracts.  Plaintiffs have not shown or alleged how many putative

17   class members entered into which types of contract.  Nor have Plaintiffs shown that any named

18   Plaintiffs entered into any of the particular types of exemplar contracts adduced.[5]  Plaintiffs have

19   therefore failed to show either numerosity or typicality.

20              It is possible that there are many more types of contract beyond the six exemplar

21   contracts produced.  Any particular type of exemplar contract (or other, unattached type of

22   contract) may have been signed by a small number of Plaintiffs and putative class members.  A

23   class action would not be appropriate for such a putative class or subclass.  And no class action

24   is appropriate to adjudicate claims arising under contracts of types that no named Plaintiff

25   _____

[5]In fact, Plaintiffs have redacted the names of the signatories to the exemplar contracts.

1    entered into.

2           Because Plaintiffs have failed to satisfy three of the four requirements of Rule 23(a)—the

3    Court assumes without deciding that Plaintiffs satisfy the adequacy-of-representation

4    requirement—it need not analyze the case under Rule 23(b).  Plaintiffs may be able to cure the

5    deficiencies noted herein, but the Court will not conditionally certify the class in the meantime.

6    *See* Fed. R. Civ. P. (c)(1) advisory committee's note to 2003 amendments.  It is possible many

7    Plaintiffs and putative class members have valid claims against Defendants on the merits, but

8    Plaintiffs have not met their burden of showing that certification of the broad classes they

9    identify is appropriate.

10          Because the type of contract will largely control the relevant issues of law, it is the

11   critical dividing line between putative subclasses in this case.  Type I contracts indicate

12   independent contractors who likely have no wage claims but may have commission and bonus

13   claims.  Type II contracts more likely indicate direct employees who may have wage claims, as

14   well.  In any case, until putative subclasses are sorted out by type of contract, the Court will not

15   be able to efficiently adjudicate pretrial motions, much less manage a trial.  Plaintiffs should

16   demonstrate which named Plaintiffs worked under which type of contract, in which locations,

17   and for which periods of time, preferably according to the type system identified herein.  They

18   should then demonstrate, or at least fairly estimate, how many other Westgate employees worked

19   under the same types of contract, in which locations, and for which periods of time.  Such a

20   demonstration will go far towards demonstrating typicality, numerosity, and commonality.

21   ///

22   ///

23   ///

24   ///

25   ///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CONCLUSION**

IT IS HEREBY ORDERED Motion to Certify Class (ECF No. 441) is DENIED.

IT IS SO ORDERED.

Dated this 9th day of May, 2011.

_____
ROBERT C. JONES
United States District Judge